**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

GABRIEL ARMENDARIZ, et al.,

   Plaintiffs,

v.              CV 09-594 WPL/LAM

GEO GROUP, INC., et al.

   Defendants.

**ORDER**

   This matter is before me on Defendants' Motion for Summary Judgment as to all of Plaintiffs' claims (Doc. 67), Plaintiffs' response (Doc. 76) and Defendants' reply (Doc.80). For the reasons that follow, I will grant the motion.

**BACKGROUND**

   The following facts are not in dispute. (*See* Doc. 67 at 2-3; Doc. 76 at 2.) Plaintiffs' claims arise out of a lockdown incident at the Northeast New Mexico Detention Facility (NENMDF) on December 10, 2008. At that time, Plaintiffs were post-conviction prisoners housed in E-pod of Housing Unit Two. At 4:53 p.m. on December 10th Defendant Timothy Hatch, warden of NENMDF, was advised of a disturbance in D-pod of Housing Unit Two. An inmate wielding a makeshift weapon had broken a security window and was refusing to submit to correctional officers. Defendant Hatch ordered the entire facility into lockdown and ordered that a chemical agent be deployed in D-pod to force the inmate into submission. In an emergency, NENMDF policy requires all inmates to be locked down and inmates who are not near their housing units to be locked down at the nearest secure location.

The remaining facts are disputed.  (*See* Doc. 67 at 3-13; Doc. 76 at 2-11.)  According to Defendants, Defendant Mike Martin and other corrections officers ordered the inhabitants of E-pod, including Plaintiffs, into lockdown, but numerous inmates resisted.  Several inmates, including Plaintiffs, entered the shower room as they were being ordered to return to their cells.  After Defendant Hatch threatened to deploy chemical agents in E-pod, most inmates returned to their cells, but Plaintiffs refused to do so.  Defendant Hatch then ordered Plaintiffs secured in the shower room. Defendant Julie Marquez was ordered to videotape the non-compliance of E-pod inmates. Defendants claim that the videotaping commenced approximately twenty minutes after officers began ordering E-pod inmates to return to their cells and lasted more than four minutes, so that Plaintiffs had nearly twenty-five minute to return to their cells before lockdown.

After all the inmates at NENMDF were locked down, correctional officers deployed a chemical agent in D-pod.  Once the disruptive inmate was removed, an emergency response team was sent in to secure D-pod, corrections officers performed a preliminary evaluation to determine if any D-pod inmates needed medical attention due to exposure to the chemical agent, and then a medical response team performed more complete evaluations.  When all inmates in D-pod were medically cleared, corrections officer decontaminated D-pod and replaced the broken security window.  These activities took approximately two hours.  Defendants assert that when a lockdown is implemented following a disturbance, no inmate is permitted to move from his secured location until an emergency count is completed and the lookdown is lifted.  It took an additional hour and a half to perform an emergency head-count of all six hundred inmates in the facility.  Upon completion of the emergency count, the lockdown was lifted and Defendant Johnson ordered Plaintiffs released from the shower room.  However, the key could not be located.  Defendants claim that Plaintiffs asked if they could crawl out of the shower room through a hole in the cinderblock

wall.  Defendant Hernandez told them that he could not order them to crawl out of the shower room but he would not discipline them for doing so.  At 9:25 p.m. all of the Plaintiffs crawled out of the shower room.

According to Plaintiffs, initially they could not hear the lockdown orders but when they did, they began exiting the showers to return to their cells.  However, Defendants ordered them back to the showers.  Contrary to Defendants' assertion that Plaintiffs had nearly twenty-five minutes to return to their cells, Plaintiffs assert that it was a matter of minutes from the time they heard the lockdown orders until they were locked in the showers.  At most, the videotape evidence shows that Plaintiffs remained in the showers after lockdown orders were issued for approximately four minutes.  More importantly according to Plaintiffs, is the excessive amount of time they were locked in the showers and the mistreatment they received during that time.

Plaintiffs contend that nothing in NENMDF policy precludes the transfer of inmates from one secure location to another between the time of a disturbance and an emergency headcount, and indeed, that other inmates were transferred within the facility while Plaintiffs remained in the showers.  It only takes two officers to conduct a headcount and, due to the disturbance, the facility had double the normal amount of staff for three or four hours.  Ultimately, it only took two NENMDF employees to return Plaintiffs to their cells.  Thus, Plaintiffs suggest that Defendants had the manpower to transfer Plaintiffs to their cells before the emergency headcount.  However, once the disruptive D-pod inmate was subdued, Defendants Hatch, Martin, and Crompton went home.  Before leaving, Defendant Hatch instructed that Plaintiffs be left in the showers until the emergency count was completed.  In Defendant Hatch's absence, Defendant Johnson oversaw the clean-up of D-pod.  Plaintiffs assert that, rather than release them from the showers, Defendant Johnson sent excess staff to write up major use of force reports and disciplinary reports on Plaintiffs.

3

Plaintiffs' claims arise from the length of time they were confined to the showers and the treatment they received while confined there.[1]  Plaintiffs assert that Defendant Marquez taunted and mocked them as she videotaped them in the showers.  They also assert that the shower room was cold and unsanitary, they were refused access to a restroom, and were forced to urinate in the shower drains.  When NENMDF officials could not locate the key to the shower room, Plaintiffs claim that Defendant Hernandez ordered them to crawl out of the showers through the cinderblock hole.  Various Plaintiffs claim that they contracted skin and nail conditions as a result of being locked in the shower and due to scratches they received as they crawled through the dirty cinderblock hole.  Plaintiff Dimas also claims that he suffered respiratory effects from exposure to the chemical agents used in D-pod.  Plaintiffs assert that Defendants ignored their requests for medical treatment of these problems.

Plaintiffs brought suit under 42 U.S.C. § 1983, alleging that Defendants deprived them of their Eighth Amendment right to be free from cruel and unusual punishment (Count I), and under New Mexico common law, alleging intentional infliction of emotion distress (Count III) and negligence (Count V).[2]  (*See* Doc. 1.)

---

[1] Although Plaintiffs suggest that their confinement to the shower was a punitive measure (*see* Doc. 76 at Fact 12), and Defendants go to lengths to justify on penological grounds Defendant Hatch's decision to lock them in the shower (*see* Doc. 67 at 4, 21-22), in disputing Defendants' proposed facts, Plaintiffs repeatedly state that facts relating to their alleged refusal to comply with lockdown orders and to Defendant Hatch's decision are "immaterial to Plaintiffs' specific claims regarding the length of time they were locked in the shower and the mistreatment they received from Defendants during that time" (*see, e.g.*, Doc. 76 at Facts 6, 7 and 8, 9, 11).  Moreover, Plaintiffs acknowledge that they "challenge, not the fact of being locked in the shower initially, but the excessive length of time and subsequent mistreatment they received."  (Doc. 76 at 18.)

[2] Plaintiffs also brought claims for unreasonable search and seizure and assault.  (*See* Doc. 1, Counts II and IV.)  Plaintiffs voluntarily dismissed these claims.  (*See* Doc. 53.)

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears "the initial burden of showing that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met this burden, the nonmoving party must identify specific facts that show the existence of a genuine issue of material fact requiring trial on the merits. *Bacchus Indus., Inc. v. Argion Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991.) A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Id.* The record and all reasonable inferences therefrom must be viewed in the light most favorable to the nonmovant. *See Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

ANALYSIS

### *Constitutional Violation*

In Count I, Plaintiffs allege violations of their Eighth Amendment right to be free from cruel and unusual punishment.[3] To prevail on a conditions of confinement claim, Plaintiffs "must

---

[3] Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983, under the Eighth and Fourteenth Amendments. (Doc. 1 at 13.) Defendants argue that Plaintiffs' Fourteenth Amendment claim fails as a matter of law because "constitutional claims brought by convicted inmates relating to their conditions of confinement must be brought under the Eighth Amendment." Defendants' argument on this point is unnecessary. Plaintiffs are not making a separate Fourteenth Amendment claim. Rather, Plaintiffs invoke the Fourteenth Amendment for its role in making the Eighth Amendment applicable to state actors. (*See* Doc. 76 at 13 n.7 ("Plaintiffs do not disagree that the Eighth Amendment controls, rather, the Eight [sic] amendment is applicable to state actors pursuant to the Fourteenth Amendment.") (citing *Handy v. Price*, 996 F.2d 1064, 1066 (10th Cir. 1993)).)

5

establish that (1) the condition complained of is 'sufficiently serious' to implicate constitutional protection, and (2) prison officials acted with 'deliberate indifference' to inmate health or safety." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).   This two-part test includes an objective and a subjective component: the alleged deprivation "must be, objectively, sufficiently serious," while a showing of deliberate indifference is necessary to demonstrate that a prison official had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834.   The Eighth Amendment "does not mandate comfortable prisons" and conditions imposed may be "restrictive and even harsh." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981).   Thus, to show that a condition is sufficiently serious, an inmate must show that "conditions were more than uncomfortable, and instead rose to the level of 'conditions posing a substantial risk of serious harm' to inmate health or safety." *DeSpain*, 264 F.3d at 973 (quoting *Farmer*, 511 U.S. at 834).   In defining the subjective requirement, the Supreme Court has explained that "deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Farmer*, 511 U.S. at 835.   Deliberate indifference is comparable to "'recklessness,' in which 'a person disregards a risk of harm of which he is aware.'" *DeSpain*, 264 F.3d at 972 (quoting *Farmer*, 511 U.S. at 836-37).   Thus, "[an] official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

A higher *mens rea* standard has been applied to officials' use of force during a prison disturbance.   "The Supreme Court [has] reasoned that in the context of a prison disturbance, the deliberate indifference standard does not adequately reflect officials' need to balance competing considerations of general health and safety and the more acute threats to inmates and staff presented

6

by the disturbance itself." *DeSpain*, 264 F.3d at 976 (citing *Whitley v. Albers*, 475 U.S. 312, 320 (1986)).  The Court indicated that the proper question is whether officials acted "'maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley*, 475 U.S. at 320-21).  Although the Supreme Court has said that the "very high state of mind" required by the malicious and sadistic standard does not apply to prison conditions cases, *see Farmer*, 511 U.S. at 836, the Tenth Circuit has recognized that "when the conditions of confinement exist in conjunction with a prison riot, the balancing considerations described in *Whitley* generally are present," *DeSpain*, 264 F.3d 976.  Nevertheless, "the standard in the aftermath of a disturbance immediately reverts back to *Farmer*'s deliberate indifference." *DeSpain*, 264 F.3d at 976.

Among Plaintiffs' allegations of unconstitutional conditions, they claim that they suffered skin and ear irritation from the chemical agent deployed in D-pod and that Plaintiff Dimas, who suffers from asthma, had trouble breathing.  (Doc. 1 at ¶¶ 46-47.)  Plaintiffs also claim that, as a result of crawling through the cinderblock hole, they suffered infections and other skin conditions. (*Id.* at ¶ 67.)  They allege that Defendants refused to give Dimas his inhaler during the incident and subsequently refused to treat their medical conditions.  The two-part deliberate indifference test also applies to claims for inadequate medical care.  *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  A medical need is sufficiently serious if it has been diagnosed by a physician as mandating treatment or if it is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  *Id.*  The subjective component is satisfied if the prison official "knows of and disregards an excessive risk to inmate health or safety."  *Id.*

**Seriousness of Conditions**

Defendants maintain that the conditions about which Plaintiffs complain were not sufficiently serious to constitute cruel and unusual punishment.  (*See* Doc. 67 at 15-19.)  First, Defendants note that Plaintiffs do not dispute that they were confined to the shower room for approximately four-and-a-half hours.  Defendants acknowledge that Plaintiffs complained that they were uncomfortable but suggest that Plaintiffs were not exposed to unsanitary or cold conditions.  Defendants thus argue that neither the conditions to which Plaintiffs were exposed nor the length of time for which they were exposed is sufficient to support an Eighth Amendment claim.

Defendants reject allegations that Defendant Marquez taunted Plaintiffs while she videotaped them and contend that, even if true, threats and verbal taunts do not violate the Eighth Amendment.  In response to the offense Plaintiffs take at the fact that they were filmed by a female officer, Defendants argue that, as inmates, Plaintiffs' limited right to privacy in their bodies must yield to the institution's penological interest in maintaining security.  Finally, Defendants maintain that Plaintiffs cannot prove that they suffered from a serious medical need.  They urge that it is highly unlikely that any of the chemical agent entered E-pod through the ventilation system, a fact which they claim Plaintiffs do not dispute.  They assert that Plaintiffs have offered no medical evidence that they suffered from a serious medical need due to exposure to a chemical agent and no medical evidence to prove that other ailments, for which Plaintiffs sought treatment months after the incident, were caused by their confinement in the shower room.

Plaintiffs dispute Defendants' contention regarding the seriousness of the conditions of their confinement.  Plaintiffs assert that they

> were locked in a cold shower room with little or no clothing for approximately four
> and a half hours, suffered the effects of chemical agents deployed in the adjacent
> pod, were taunted and ridiculed, were denied access to needed medical attention and

8

> to toilet facilities, and ultimately were forced to crawl through a filthy cinder block hole in the shower room wall in order to get out because the key to the shower room could not be found [and that] Defendant's actions in this matter run afoul of the 'basic concept underlying the Eighth Amendment, which is nothing less than the dignity of man.'

(Doc. 76 at 1 (internal punctuation omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).)

Many of the facts regarding Plaintiffs' confinement in the shower room are disputed. First, although Plaintiffs do not dispute that they were confined for approximately four-and-a-half hours, they argue that this amount of time was excessive. They contend that nothing in NENMDF policy precludes the transfer of inmates from one secure location to another between the time of a disturbance and an emergency count, suggesting that they should have been returned to their cells after the disturbance had been addressed. Defendants cite several NENMDF policies to show that no inmate may be moved from his secure location until an emergency count is completed and the lockdown is lifted. However, none of the cited policies establish this. Under the heading "Proper Procedures for Clearing Areas where Inmates are Congregated During a Disturbance," policy 9.008(D)(3) states,

> Inmates in non-effected areas will remain secured in those areas. All uninvolved inmates will be secured in whatever area they are presently in within the institution at the time of the disturbance . . . .

By its terms, this policy appears to apply during a disturbance, not after it has been controlled, and it does not address the procedures for an emergency count. Under the heading, "Unit Post Disturbance Procedures," policy "9.008(J) provides,

> The Unit Operation Director and the Incident Commander have responsibility to ensure the following post disturbance activities are accomplished.
> . . .
> 7.     That an emergency count has been conducted and all inmates accounted for.

This policy establishes the responsibility of NENMDF officials for conducting an emergency head count, but does not state that inmates may not be transferred to their cells between the time of the disturbance and the count.  Finally, policy 8.005(B) governing emergency counts, states, "In the event an emergency count is announced all inmates will immediately return to their assigned housing unit/dorm."  Policy 8.005(C), governing out count procedures, states,

> All inmates assigned to a detail will be directed to a designated area where they will give their names and numbers to the assigned supervisor.  Once inmates are placed on out-count status they will remain in the assigned area until count is secure.
>    . . .
> 4.    In the event of an emergency count, all details will immediately terminate, and all inmates will be secured in their cells.

Neither of these two policies applies precisely to Plaintiffs' situation.  They were already in their housing unit/dorm when they were locked in the shower room.  Policy 8.005(B) does not say that they could not be transferred from the shower to their cells.  Although policy 8.005(C) states that once inmates are placed on out count status they will remain there until count is secure, it is not clear that Plaintiffs were on "out count" status.  They were not assigned to a detail.  Moreover, 8.005(C)(4) provides that, if an emergency count is called, details immediately terminate and inmates must be secured in their cells.  If Plaintiffs were treated as part of a detail, this policy suggests they should have been transferred back to their cells.

Defendants also provide the affidavit of Defendant Hatch in which he states that "inmates are not permitted to move from their secured locations before an emergency count is completed to assure the count is accurate and to assure security is maintained during the count."  (Doc. 67 Ex. A at ¶ 7.)  However, as described, NENMDF policy, which presumably governs Hatch's actions and supplies his understanding of what is permissible, does not support this statement.

Second, Defendants cite the deposition of Plaintiff Armendariz as proof that Plaintiffs had at least towels and boxer shorts with them while they showered.  Armendariz does admit to having a towel and boxer shorts with him in the shower.  (*See* Doc. 67 Ex. E at 49:17-19.)  However, Plaintiffs point out that Plaintiff Dominguez did not have a towel or boxer shorts with him in the shower as they were on a hook outside the shower room.  (*See* Doc. 76 Ex. 6.)

With regard to the temperature, Defendants provide affidavits from Jim Mize, the facility maintenance manager, and Gary Montoya, the fire and safety manager, who testified that the automatic environmental control system that regulates the temperature at NENMDF maintains the temperature in E-pod at 72 degrees Fahrenheit 24 hours a day, seven days a week and that, at 6:15 p.m. on December 10, 2008 an environmental survey reported that the temperature in E-pod was between 71.8 and 73.1 degrees Fahrenheit.[4]  (*See* Doc. 67 Exs. K, L.)  Plaintiffs offer the deposition testimony of inmate-witness Morales who said that it is really cold in December at NENMDF and it was "really cold" in the shower, and an affidavit by inmate-witness Sandoval who testified that the inmates in the shower had said that it was "too cold to even turn the water on."  (Doc. 76 Ex. 1 at 2, Ex. 3 at 15:7-19.)  Plaintiffs also provide excerpts from the deposition of Defendant Hernandez, claiming that he testified that the exhaust fans used to extract the chemical agent from D-pod brought cold air into the facility and inmates complained about it being cold.  (Doc. 76 Ex. 16 at

---

[4] In his affidavit, Gary Montoya refers to this environmental survey as "Attachment B." (*See* Doc. 67 Ex. L at 2.)  This attachment was not provided to the court for consideration.  Federal Rule of Civil Procedure 56 states that, "[i]f a paper . . . is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit."  FED. R. CIV. P. 56(e)(1).  Only admissible evidence may be considered by a court when ruling on a motion for summary judgment. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.1985).  To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence. *Ortiz v. Wingard*, 173 F. Supp. 2d 1155, 1163 (D.N.M. 2001).  Nevertheless, the Defendants offer sworn affidavit testimony from Mize and Montoya.  Moreover, as described below, even accepting Plaintiffs' version of the facts, Defendants are entitled to summary judgment, thus their failure to provide Attachment B is inconsequential.

62:4-15.)  Later excerpts from Hernandez's deposition clarify that his testimony is that exhaust fans in D-pod made D-pod cold but that they did not affect the temperature in other areas of Housing Unit Two.  (*Id.* at 63:21-64:14.)

With regard to Plaintiffs' allegations that Defendants mocked and taunted them, Defendants posit that the videotape of the incident provides indisputable video evidence that Defendant Marquez was not "giggling or dancing."  (*See* Doc. 67 at 17 (citing Ex. D).)  Defendants point out that Plaintiff Armendariz admits that Marquez was not "giggling and dancing" but was merely "smiling, lifting her eyebrows, and moving her shoulders back and forth."  (Doc. 67 Ex. E at 71-72.) Defendants also cite statements by several corrections officers in which they deny taunting Plaintiffs while they were in the shower room.  (*See* Doc. 67 Ex. H at 1 (Hernandez Affidavit stating, "I never heard or saw any correctional officers verbally taunt Plaintiffs, and I never did so"); Ex. I at 51:13-24 (Marquez Deposition denying allegations of taunting); Ex. J at 12:14-24, 30:4-19 (Zangerle Deposition denying allegations of joking about inmates).)  Plaintiffs suggest that Defendants mischaracterize the testimony of Plaintiff Armendariz but do not point to anything from Armendariz's deposition to challenge Defendants' characterization.  Plaintiffs do cite the deposition of Plaintiff Dimas in which he describes Marquez as "moving her shoulders and laughing and stuff, like 'hee, hee, hee'" and explains that by "giggling" he means that she was laughing out loud and he could hear her.  (Doc. 76 Ex. 5 at 68:17-69:1.)  Plaintiffs also cite statements by three inmate witnesses to the effect that Marquez mocked Plaintiffs while they were in the shower.  (*See* Doc. 76 Ex. 14 at 2, Ex. 15 at 1, Ex. 3 at 11:13-12:1, 34:21-36:5.)  In addition, Plaintiffs challenge the accuracy and completeness of the DVD recording.[5]

---

[5] Plaintiffs cite Marquez's deposition in which she testified that she videotaped E-pod for approximately 20 minutes from D space–the space between the doors to the pods—that she did not film the

Plaintiffs claim that they were denied access to toilet facilities while they were confined to the shower room.  Plaintiffs Armendariz, Dimas and Dominguez testified that they asked to use the bathroom but were refused.  (Doc. 76 Ex. 4 at 66:16-67:6, Ex. 5 at 62:2-9, 64:17-65:4, Ex. 6.)  At least two inmates urinated in the shower drains.  (Doc. 76 Ex. 4 at 57:13-18, Ex. 5 at 62:20-63:8.)  Inmate-witnesses also testified that they heard Plaintiffs ask to use the bathroom.  (Doc. 76 Ex. 3, at 13:1-13, Ex. 14 at 2.)  Defendants do not specifically dispute that Plaintiffs were denied access to a bathroom.  Rather Defendants claim that toilets may be unavailable for a period of time without violating the Eighth Amendment.  (Doc. 67 at 16 n.4 (citing *DeSpain*, 264 F.3d at 974).)

The parties do dispute how it came to be that Plaintiffs crawled out of the shower through the cinderblock hole in the wall.  Defendants cite the affidavit of Defendant Hernandez in which he asserts that, when the key to the shower room could not be located, Plaintiffs asked whether they could crawl out through the hole and he told them that "[he] could not order them to crawl out of the shower room, but that [he] would not discipline them for doing so."  (Doc. 67 Ex. H at 2.)  However, according to inmate-witnesses Martinez and Mezzetti, Plaintiffs were forced to crawl

---

closing of the shower doors, and that she did not film after the doors were closed.  (Doc. 76 Ex. 13 at 29:3-17, 38:12-14, 44:9-46:14.)  I have reviewed two videos: Exhibit D to Defendants' motion for summary judgment (*see* Doc. 67) and Exhibit 3 to Plaintiffs' motion to exclude the testimony of Patrick W. Keohane (*see* Doc 69).  Although Defendants describe Exhibit D as approximately five minutes in length, the DVD that I received contains two video segments.  The first is a one second glimpse of several prison officials walking through the facility.  The second lasts three minutes and twenty-four seconds.  It first shows officials locking down an unidentified pod at NENMDF—Defendants assert that this is A-pod (*see* Doc. 67 at 6 n. 2)—and then shows officials locking down E-pod.  It appears from this video that Marquez filmed E-pod from the D space as she testified in her deposition.  Plaintiffs' Exhibit 3 shows officials locking Plaintiffs in the shower room.  It demonstrates that Marquez not only filmed the closing of the shower doors, but appears to have been just outside the shower room, no longer in the D space.  The parties provide no explanation in their briefing on the summary judgment motion for the piecemeal presentation of this video evidence, in segments and on two separate DVDs.  In their motion to exclude, Plaintiffs offer only that Exhibit 3 and Defendants' Exhibit D "contain all of DVD video recording of Plaintiffs in the E-pod shower produced by Defendants in this litigation."  (Doc. 69 at 4 n.1)  Based on the inconsistencies between the video evidence and Marquez's deposition testimony and the fact that Exhibit D does not even contain the five minutes of video that Defendants claim, I do not consider it "indisputable video evidence" as Defendants urge.

through the hole.  (Doc. 76 Ex. 14 at 2, Ex. 15 at 2.)  Inmate-witness Morales testified that one of the officers told them, "If you want to get out, get out through that hole."  (Doc. 76 Ex. 3 at 12:23-25.)  Plaintiffs Armendariz and Dimas testified that Defendant Hernandez told them that the key could not be found and they would have to crawl through the hole or stay confined to the shower. (Doc. 76 Ex. 4 at 73:22-74:14, 76:12-15, Ex. 5 at 69:9-21.)

The parties also dispute the effect of the chemical agent on Plaintiffs.  The facility manager testified in his affidavit that D-pod and E-pod each have their own air handling systems, which draw ten percent of their air from outside the facility while the remaining ninety percent is recirculated from the same pod and each vents to outside of the facility.  (Doc. 67 Ex. K at ¶ 5.)  According to Mize, the only way for a chemical agent from D-pod to enter E-pod through the air handling system would be if vented air from D-pod was captured with the fresh intake air for E-pod, a very unlikely event given that only ten percent of the air in E-pod's system is from outside.  (*Id.* at ¶¶ 6-7.) Moreover, air entering E-pod is first passed through a particle filter, and, because the chemical agent used was a particle agent, nearly all of the particles would have been filtered out.  (*Id.* at ¶ 7.) Plaintiffs respond with excerpts from the depositions of Defendants Hatch and Johnson in which both men confirm that the exhaust fans in D-pod were not turned on to extract the chemical agent until the disruptive inmate had been subdued.[6]  (*See* Doc. 76 Ex. 7 at 27:1-7, Ex. 9 at 34:4-13.)  In addition, several Plaintiffs' witnesses claim that the chemical agent affected them in E-pod.  (*See* Doc. 76 Ex. 14 at 2 (Affidavit of Oscar Martinez stating that "the gas from D-pod was heavy in E-

---

[6] Plaintiffs' purpose in providing this evidence is unclear.  Perhaps Plaintiffs intend to show that the contaminated air from D-pod could have infiltrated E-pod from within the building, before it was vented, although Plaintiffs do not specifically make this argument.  Also this evidence undermines their argument that the shower was cold because the exhaust fans extracting the chemical agent from D-pod brought cold air into the facility.

pod too [and that] in my cell, I coughed from it"); Ex. 15 at 2 (Affidavit of Ryan Mezzetti stating that the gas was very strong in E-pod and that "even in my cell with a towel under the door, my skin burned"); Ex. 3 at 16:21-17:12 (Morales Deposition explaining that the effects of the gas were harsh and that the inmates wet towels and put them under the doors to prevent the chemical from entering their cells).)

With regard to Plaintiffs' medical complaints, Defendants contend that Plaintiffs have no medical evidence to show that they suffered from a serious medical need. Plaintiffs' complaints range from exposure to MRSA (staph infection) to skin irritations and nail fungus. Plaintiff Dimas additionally complains of respiratory problems related to asthma, triggered by the exposure to the chemical agent. Defendants first deny that there is any evidence that Plaintiffs were exposed to or contracted staph infection. Montoya testified that inmate showers are cleaned five days per week with Laser Clean, a degreaser, and 64-LQ, a disinfectant, and at least every two weeks with Green d Pro 5, a hospital grade disinfectant. (Ex. L) Montoya further testified that, according to his records, the shower room in E-pod was cleaned with a hospital grade disinfectant on December 2, 2008.[7] (*Id.*) Defendants also point to Plaintiffs' medical records to show that Plaintiffs did not seek medical attention for their current complaints until months after the incident, and to show that their complaints did not constitute a serious medical need.

There are at least some records to support Plaintiffs' claim that they sought medical treatment. On January 15, 2009, Plaintiff Armendariz filed an informal complaint claiming that he had been having problems with his skin since he was forced to crawl through the cinderblock hole and that he had requested medical attention on December 12th, December 20th, and January 6th.

---

[7] There is no indication that such records were attached to Mr. Montoya's affidavit and they were not provided to the court. *See supra*, note 4.

(*See* Doc. 76 Ex. 21 at 1-2.)  His January 6th request is attached to Defendants' motion.  He complains that he "ha[s] been developing a rash and hive [sic] on [his] arms, back and legs from having to crawl through a cinder block hole in the shower."  (Doc. 67 Ex. N.)  He was seen on January 14, 2009.  The medical staff notes indicated that no hives were noted and Armendariz should "RTC when hives active."  (*Id.*)  Armendariz also discussed his requests for medical treatment in his deposition.  On February 2, 2009, Armendariz again saw medical staff for hives.  (*See* Doc. 67 Ex. E at 84.)  According to Armendariz, the nurse "found what she didn't think was hives."  (*Id.* at 86.)  She gave him a pass to return to medical for medication when they got worse.  (*Id.* at 86-87.)  Although no specific records were discussed, apparently Armendariz did return and received allergy medication.  (*Id.* at 88.)  On April 2, 2009, Armendariz complained of toenail fungus.  (*Id.* at 83.)  He claims that it was due to being locked in the shower on December 10, 2008 but he did not complain earlier because it was not visible enough to make him think that it needed attention.  (*Id.* at 86.)  He was prescribed Diflucan.  (*Id.* at 84.)

On December 18, 2008, Plaintiff Dimas filed an informal complaint regarding the incident on December 10th.  (*See* Doc. 76 Ex. 21 at 4.)  In it he claims that he repeatedly asked for his inhaler for his asthma because the gas made it difficult to breath and affected his illness and that he was ignored.  (*Id.*)  He also claims that he received a rash on his ankles after crawling through the hole in the wall.  (*Id.*)  On January 19, 2009, Dimas complained that he had put in several requests for medical attention for his asthma "due to irratution [sic] from gas on Dec. 10/08" but he did not get a response or treatment for any of his medical needs.  (*Id.* at 5-6.)  He claimed to still be suffering from his asthma and shortness of breath.  (*Id.*)  These requests were not provided to the court, but Dimas did discuss some of his medical records at his deposition.  In January, he complained of a sore throat.  (Doc. 67 Ex. O at 84.)  He was seen on January 20, 2009.  He admits that he did not

16

complain about asthma or a rash on his ankle.  (*Id.* at 86-87.)  Dimas also had an appointment on February 5, 2009 for a small lump on his neck.  (*Id.* at 88.)  He did not complaint about asthma or a rash at this appointment either.  (*Id.*)  On February 24, 2009, Dimas requested medical treatment for a lump on his neck and for his asthma and a cream or antibiotic for a rash on his ankle.  (Doc. 76 Ex. 21 at 7.)  He noted that he had put in medical requests "for all of these things and only got a response for one."  (*Id.*)  The request contains an annotation to "see sick call 3/1/09."  (*Id.*)  No records from March 1, 2009 were provided to the court.

Plaintiff Dominguez filed a health service request form on January 14, 2009, stating that he "was forced to go through a hole in the shower and [] got some weird bumps on [his] neck and back area."  (*Id.* at 8.)  He also claims that he put in two other request forms without response.  (*Id.*)  The medical records reflect that he was seen on January 23, 2009.  The nurse noted "2 small red areas, one on neck and one on back."  (*Id.*)  They were not warm to the touch and there was no drainage.  The nurse referred Dominguez to a doctor and advised him to keep the skin clean and dry.  (*Id.*)  There are no further records regarding this issue.  Plaintiff Esquibel filed health service request forms in December, January, February and March.  On December 13, 2008, he complained of "foot and back problems."  (*Id.* at 9.)  A notation indicates that he was seen in the clinic on January 16, 2009.  No further information is provided.  On January 23, 2009, he complained of athlete's foot and a stuffy nose.  (*Id.* at 10.)  He was seen on January 24, 2009 and the medical staff's notes indicate a rash-like appearance on his feet.  It appears that he was proscribed "tolfanate [sic] cream" for his feet.  (*Id.*)  On February 24, 2009 he complained of bumps under his skin on his chest.  (*Id.* at 11.)  He was assessed on March 3, 2009 and prescribed hydrocortizone 10% cream.  On March 28, 2009 he complained of extreme elbow pain and was seen on April 5, 2009.  (*Id.* at 12.)  The medical staff noted that a protocol for "strain/sprain/generalized pain" should be used.  (*Id.*)

17

Finally, Alex Maldonado filed a health service request form on December 31, 2008 complaining of nail fungus on his fingers. (*Id.* at 13.) A notation indicates that he did not show for his appointment on January 14, 2009. On February 11, 2009, he again complained of "a problem with fungus on [his] toes and finger nails after [he] was locked in the showers in December 2008." (*Id.* at 14.) He claims that he put in a request before but did not get a response. He was seen in the clinic on February 14, 2009 and prescribed an antifungal cream. (*Id.* at 15.)

Although I cannot say that Plaintiffs have demonstrated the existence of a genuine issue of material fact with regard to all of their complaints,[8] I will accept Plaintiffs' version of the facts as true for purposes of this motion. Summary judgment requires that material facts be construed in favor of Plaintiffs, the non-moving party. *DeSpain*, 264 F.3d at 972. Even accepting Plaintiffs' version of the facts, they have not demonstrated any Eighth Amendment violations as a matter of law. None of Plaintiffs' complaints amount to serious conditions under Tenth Circuit jurisprudence.

"An inquiry into conditions of confinement by necessity relies on the particular facts of each situation; the circumstances, nature, and duration of the challenged conditions must be carefully considered." *Id.* at 974 (internal quotations ommitted). Here, Plaintiffs claim that they were locked in a cold shower room with little or no clothing for four-and-a-half hours, they suffered the effects of the chemical agent deployed in D-pod, were taunted and ridiculed, denied medical attention and access to toilets, and ultimately forced to crawl through a hole in the wall because the key to the shower room had been lost. "While no single factor controls the outcome of these cases, the length

---

[8] For example, vague statements from inmate witnesses that it was cold in E-pod do not reflect a genuine issue of material fact in light of sworn testimony from the facility maintenance manager and the fire and safety manager that the automatic environmental control system maintains the temperature in E-pod at 72 degrees Fahrenheit and that the temperature at 6:15 p.m. on December 10, 2008 was between 71.8 and 73.1 degrees Fahrenheit.

of exposure to the conditions is often of prime importance." *Id.*  Four-and-a-half hours is a very short period of time.[9]  The Tenth Circuit has held that a situation involving "filthy cells, poor lighting, inadequate ventilation or air cooling, and unappetizing food 'simply [did] not rise to the level of a constitutional violation' where prisoners were exposed to the conditions for only forty-eight hours." *Id.*  (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998)).  The Supreme Court noted that a "filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978).  Other circuits have found that even worse conditions fail to state a claim due to the brief duration of incarceration.  *See, e.g.*, *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994) (deplorably filthy and patently offensive cell with excrement and vomit not unconstitutional because conditions lasted only for 24 hours); *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (eleven-day stay in unsanitary cell not unconstitutional because of relative brevity of stay and availability of cleaning supplies); *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (five-day stay in "filthy, roach-infested cell" not unconstitutional); *see also Ogbolu v. McLemore*, No. 96-6275, 1997 WL 49449, at *2 (10th Cir. Feb.7, 1997) (cold, wet, drafty, and unsanitary solitary cell for two days does not violate Eighth Amendment) (unpublished).  "In general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while substantial deprivations of shelter, food, drinking water, and sanitation may meet the standard despite a shorter duration." *DeSpain*, 264 F.3d at 974 (internal quotations omitted).

---

[9] Plaintiffs do not challenge the fact of their confinement, only that the duration was excessive and that Defendants should have returned them to their cells after the disturbance in D-pod was addressed.  *See supra*, note 1.  Thus, Plaintiffs' complaint could be read as challenging only the two to two-and-a-half hours they were confined after the disturbance in D-pod was controlled, an even shorter period of time.

Accepting Plaintiffs' version of the facts, the deprivations in this case simply were not severe enough to rise to the level of constitutional violations in just four-and-a-half hours. Plaintiffs claim that they were "cold" but provide no specific evidence as to how cold it was. Even with little or no clothing, being "cold" for four-and-a-half hours is not sufficiently serious.

They were denied access to toilet facilities. There is evidence that two inmates urinated in the shower drain. However, there are no allegations and no evidence that Plaintiffs were exposed to human waste as a result. While "exposure to human waste carries particular weight in the conditions calculus," there is "no doubt that toilets can be unavailable for some period of time without violating the Eighth Amendment." *DeSpain*, 264 F.3d at 974 (internal quotations omitted). This lack of access to toilets for four-and-a-half hours is not a serious deprivation.

Defendant Marquez and others taunted and ridiculed Plaintiffs while they were confined to the shower. However, such threats and verbal taunts do not violate the Eighth Amendment. *See McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) (finding official's threat to spray inmate with mace did not violate constitutional rights); *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982) (holding that comment by female guard regarding nudity of male inmates did not constitute cruel and unusual punishment) (per curiam); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (finding, in case where sheriff allegedly threatened to hang inmate, that "verbal harassment or abuse of the sort alleged in this case is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983") (per curiam). To the extent that Plaintiffs complain that Marquez, a female, filmed them, this claim must be considered in light of the circumstances and nature of Plaintiffs' confinement. Plaintiffs do not dispute that they were locked in the shower in the context of a prison disturbance and do not challenge Hatch's initial decision to confine them to the shower. *See supra*, note 1. Courts should not second guess prison officials in the administration of their facilities. *See Rhodes*,

20

452 U.S. at 351 (acknowledging the challenges of prison administration).  Although Plaintiffs suggest that Marquez was not the officer assigned to video duty, they do not dispute that Hatch ordered her to film for disciplinary purposes.  In such circumstances, their objections to being filmed by a female guard must yield to the institution's interest in security.  *See Cumbey*, 684 F.2d at 714.

Plaintiffs claim that they were forced to crawl through a filthy hole in the wall because the key could not be located and as a result they suffered skin and nail infections.  There is no evidence that Plaintiffs could not have chosen to remain in the shower until the key was located and no evidence that Defendants intentionally withheld the key to force Plaintiffs to crawl through the hole. Plaintiffs' evidence shows that Defendants told them that the key could not be found and they would have to crawl out to get out, but does not show that Defendants would not allow them to remain in the shower until the key was found.  The fact that Plaintiffs had to crawl through the hole to exit the shower in this instance does not violate the Eighth Amendment.

Plaintiffs also failed to demonstrate that their medical needs were sufficiently serious to satisfy the objective requirement.  Plaintiff Dimas apparently was the only person who complained of a medical condition while confined to the shower.  He claimed that the tear gas "put[] a strain on breathing" and he "just kind of started panicking."  (Doc. 76 Ex. 5 at 56:2-9, 56:19-57:2.)  He asked several officers for his inhaler but they refused.  (*Id.* at 57:3-7.)  A medical need is sufficiently serious if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  *See Sealock*, at 1209.  There is no medical evidence in the record that Dimas had previously been diagnosed with asthma or prescribed an inhaler or other treatment for asthma and no evidence that he was diagnosed with asthma or prescribed any treatment after the incident.  With the exception of Dimas's vague statement that the gas strained his breathing and he "kind of started panicking" there is no evidence

21

regarding what he experienced on December 10, 2008 from which to evaluate whether his need was so serious that even a lay person would recognize the necessity of an inhaler.[10]  In short, Plaintiffs have not demonstrated that Dimas's medical need was sufficiently serious.

Similarly, Plaintiffs' other complaints of skin problems, rash, athlete's foot, and nail fungus are not comparable in severity to the types of conditions that the Tenth Circuit has found to be sufficiently serious.  *See, e.g.*, *Martinez v. Beggs*, 563 F.3d 1082, 1088-89 (10th Cir. 2009) (death); *Sealock*, 218 F.3d at 1210 (heart attack symptoms); *Mata*, 427 F.3d at 755 (same); *Johnson v. Mullin*, 422 F.3d 1184, 1186 (10th Cir. 2005) (bleeding, swelling, infection of the mouth and severe pain); *Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001) (severed, reattached, decaying finger).  Moreover, "a delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm[, which] may be satisfied by lifelong handicap, permanent loss, or considerable pain."  *Mata*, 427 F.3d at 751.

There is no record regarding what, if any, treatment Plaintiff Dimas received for the rash on his ankle.  Although Dimas's records indicate that one of his complaints was addressed and he received a "sick call" on March 1, 2009, no details are provided.  There is no description of the severity of the rash and no allegation that delay in treatment resulted in "lifelong handicap, permanent loss, or considerable pain."   The nurse who evaluated the bumps on Plaintiff Dominguez's skin noted "two small red areas" that were not warm or draining.  Although the nurse referred Dominguez to a doctor, there is no evidence of a diagnosis or that the doctor prescribed treatment and nothing to suggest that the condition was serious.

---

[10] Plaintiffs have not demonstrated either that the symptoms Dimas experienced while in the shower were themselves sufficiently serious, or that a sufficiently serious harm resulted.  *See Mata v. Saiz*, 427 F.3d 745, 753-55 (10th Cir. 2005).

Plaintiffs Armendariz, Esquibal and Alex Maldonado all received treatment for their medical complaints. Armendariz saw a medical provider in January and February 2009 for his complaints of hives and received an allergy medication to treat them. He also saw a medical provider in April 2009 regarding a toenail fungus and was prescribed Diflucan. On January 24, 2009 Esquibel was prescribed tolnaftate cream for athlete's foot and on March 3, 2009 he was prescribed hydrocortizone 10% cream for a skin condition on his chest. Maldonado received an antifungal cream in February for a nail fungus. There is no medical evidence that these conditions were due to the events of December 10, 2008. Moreover, the fact that both Plaintiffs were treated promptly after requesting health services demonstrates that Defendants were not deliberately indifferent, as described below.

In sum, the deprivations Plaintiffs complain of are not sufficiently serious to constitute Eighth Amendment violations. Even when considered in combination, Plaintiffs have not established unconstitutional conditions. *See Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (noting that "nothing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists").

**Deliberate Indifference**

Defendants alternatively argue that, even if the challenged conditions of confinement are sufficiently serious, Plaintiffs cannot demonstrate that Defendants acted with the requisite mental state. (*See* Doc. 67 at 20-23.) According to Defendants, Hatch decided to secure Plaintiffs in the shower room in connection with his efforts to defuse the disturbance in D-pod. Because Plaintiffs are challenging the conditions of confinement during a disturbance, Defendants maintain that *Whitley*'s "malicious and sadistic" standard applies to Defendants' actions. Defendants claim that Hatch's decision to secure Plaintiffs in the shower was made under significant time pressure while

23

addressing an ongoing disturbance in D-pod and with the concern that Plaintiffs' refusal to lockdown might be indicative of a larger planned disturbance.  It took two hours to resolve the D-pod disturbance and an hour and a half to perform an emergency count, and Plaintiffs were released shortly after the emergency count was completed.  Defendants argue that Hatch's decision was driven by a legitimate penological interest in "maintaining institutional security and preserving internal order and discipline" and that his actions cannot be characterized as deliberately indifferent or malicious and sadistic.  (Doc. 67 at 22 (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).)  Also, because Defendants find no evidence that the shower room was cold or unsanitary or that Plaintiffs were exposed to the chemical agent or staph, and find no evidence that Plaintiffs suffered any adverse health effects related to their confinement in the shower, Defendants argue that Plaintiffs cannot demonstrate that Defendants were aware of any potential harm to Plaintiffs or that Defendants acted maliciously and sadistically to cause them harm.  (*Id.* at 22-23.)

The malicious and sadistic standard is not appropriate for this case.  As the Tenth Circuit has explained, "As soon as the inmates are secure and present no further danger to prison staff, the public, or each other, [] there is no longer a need for officials to make split-second, life-and-death decisions." *DeSpain*, 264 F.3d at 976.  While Defendant Hatch's decision to confine Plaintiffs to the shower arguably was made under time pressure in the context of responding to a prison disturbance, Plaintiffs do not challenge that decision itself.  *See supra*, note 1.  Once lockdown was complete, the need for "split-second, life-and-death decisions" had clearly passed.  There is no indication of an ongoing threat to safety during the duration of Plaintiffs' confinement.  *See DeSpain*, 264 F.3d at 976.  Accordingly, I find deliberate indifference to be the appropriate standard for this case.

Nevertheless, Plaintiffs have not shown that Defendants disregarded a substantial risk of

24

serious harm.  Accepting Plaintiffs' version of the facts, Defendants knew that Plaintiffs were uncomfortable: they knew Plaintiffs asked for additional dry clothes and could infer that Plaintiffs were cold and they knew Plaintiffs asked for access to toilets.  However, Plaintiffs have not shown that Defendants knew of and disregarded a substantial risk of serious harm due to these uncomfortable conditions.  Similarly, there is no evidence that Defendants knew of and disregarded a substantial risk of serious harm in connection with the verbal taunting.

In their complaint, Plaintiffs allege that there was an outbreak of MRSA at NENMDF in the fall of 2008 and that NENMDF informed its staff of the dangers of staph and MRSA by memo a few weeks before the incident.  (*See* Doc. 1 at ¶¶ 60-61.)  However, Plaintiffs provide no evidence to support these allegations and thus there is no evidence that Defendants were aware that Plaintiffs faced a substantial risk of serious harm by crawling through the cinderblock hole when the key to the shower room could not be located.

Finally, Plaintiffs have not demonstrated deliberate indifference on the part of Defendants to a serious medical need.  Assuming that Dimas asked various Defendants for his inhaler when the chemical agent allegedly affected his respiration, there is no evidence that Defendants knew that Dimas suffered from asthma or was prescribed an inhaler and no evidence to suggest that Defendants knew that Dimas's condition presented a substantial risk of serious harm without his inhaler.[11]  On February 24, 2009, Dimas requested treatment for a rash on his ankle and asthma.  The request is annotated, "see sick call 3/1/09."  Defendants thus appear to have responded to the request although there are no details regarding the response, or any subsequent complaints.

Defendants responded to Armendariz's complaints of hives on January 14, 2009 and

---

[11] Notably, Dimas acknowledged that Defendants themselves were not wearing gas masks in E-pod at the time he complained that he was affected by the chemical agent.  (*See* Doc. 76 Ex. 5 at 58:7-16.)

February 2, 2009 and on a later unidentified date.  They also responded to his complaint regarding a toenail fungus on April 2, 2009.  Defendants addressed Plaintiff Esquibel's January 23rd complaint of athlete's foot on January 24, 2009 and his February 24th complaint of a skin condition on March 3, 2009.  Plaintiff Maldonado complained of a nail fungus on December 31, 2008 but did not appear for his January 14, 2009 appointment.  When he again complained on February 11, he was seen and treated on February 14, 2009.  In short, Plaintiffs have not demonstrated that Defendants were deliberately indifferent to their serious medical needs.

In sum, Plaintiffs complain of certain conditions arising out of their four-and-a-half hour confinement to the shower room at NENMDF during a prison disturbance on December 10, 2008. These conditions are not sufficiently serious to constitute constitutional violations under the Eighth Amendment.  Additionally, Plaintiffs have not demonstrated that Defendants were deliberately indifferent to a substantial risk of serious harm.  Accordingly, Defendants' motion for summary judge is granted as to all of Plaintiffs' § 1983 claims.

### State Law Claims

With the grant of summary judgment on Plaintiffs' § 1983 claims, the only claims remaining in this case are state law claims for negligence and intentional infliction of emotional distress. Defendants argue that Plaintiffs' state law claims fail as a matter of law because Plaintiffs cannot satisfy any of the elements of either claim.

To establish a claim for intentional infliction of emotional distress, Plaintiffs must prove that "(1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress."  *Baldonado v. El Paso Natural Gas Co.*, 176 P.3d 277, 283 (N.M. 2007).

26

This claim is easily resolved in Defendants' favor because Plaintiffs have not demonstrated any mental distress, much less the extreme and severe mental distress necessary to prove a claim for intentional infliction of emotional distress.  Defendants argue that Plaintiffs "have not alleged they suffered distress which required any treatment from a mental health provider."  (Doc. 67 at 24.) They cite no authority for this standard.  According to the New Mexico Uniform Jury Instructions, "emotional distress is 'severe' if it is of such an intensity and duration that no ordinary person would be expected to tolerate it."  NM UJI 13-1628; *see also Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 41 P.3d 333, 342-43 (N.M. 2001) (citing NM UJI 13-1628).

In their complaint, Plaintiffs allege that "in addition to the [] physical injuries suffered as a result of this incident, all Plaintiffs suffered emotional, mental, and physical suffering."  (Doc. 1 at p. 83)  However, they provide no evidence of emotional or mental suffering on the part of any Plaitniffs except for Plaintiff Dimas, who stated in his deposition that the gas "put[] a strain on breathing" and he "just kind of started panicking."  (Doc. 76 Ex 5 at 56:8-9, 56:25-57:2.)  But Plaintiffs provide no evidence regarding the intensity or duration of Dimas's "panic attack." Plaintiffs clearly have not established emotional distress so severe that no ordinary person would be expected to tolerate it and summary judgment is therefore granted in favor of Defendants.

With regard to Plaintiffs' negligence claim, Defendants argue that they did not breach any duty of ordinary care to Plaintiffs.  "A negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 73 P.3d 181, 185-86 (N.M. 2003).  A finding of negligence thus depends on the existence of a duty on the part of the defendant.  Whether a defendant owes a duty of care to a plaintiff is a question of law for the courts to decide.  *Id.* at 186.  It is well established in New

Mexico that if both the plaintiff himself and the injury to the plaintiff were foreseeable, then the defendant owed a duty of care to that plaintiff. *Crespin v. Albuquerque Baseball Club, LLC*, 216 P.3d 827, 831 (N.M. Ct. App. 2009). Additionally, every person has a duty to exercise ordinary care for the safety and the property of others. *Id.*

Defendants argue that they owed no duty to Plaintiffs because there is no evidence to suggest that a reasonably prudent person would foresee that securing Plaintiffs in the shower room involved an unreasonable risk of injury to Plaintiffs. (Doc. 67 at 25.) I agree with Defendants that the decision to confine Plaintiffs to the shower did not involve a foreseeable risk of injury to Plaintiffs and thus did not give rise to any particular duty on the part of Defendants. In their motion, Defendants ask "what risk of injury did Plaintiffs face?" (*Id.*) Plaintiffs respond with the deposition testimony of Gary Montoya, NENMDF's fire and safety director, in which he states that he would be concerned if inmates or staff are locked in an area and cannot be let out because, in the event that an evacuation is necessary, the keys would need to be available. The problem with Plaintiffs' argument is that there is no evidence that keys are kept in a location that few people have access to, or that officers take the keys home with them, or any other scenario that would suggest that the unavailability of a key would be foreseeable. At a detention facility, specifically designed to lock inmates in various areas for security purposes, keys are a regular part of the operation of the facility. The fact that the shower room key was lost on this particular occasion was not a foreseeable event and Plaintiffs have identified no other foreseeable risk of injury.

Nor did Defendants breach their duty of ordinary care. "The question of whether a defendant has breached the duty of ordinary care is generally a question of fact, but if no reasonable fact finder can conclude that the defendant was negligent, summary judgment is appropriate." *Crespin*, 216 P.3d at 835. Plaintiffs argue that Defendants had a "duty to exercise reasonable care and diligence

28

to protect the prisoner from danger, known to or which might reasonably be apprehended by him." (Doc. 76 at 21-22 (citing *Muniz v. U.S.*, 280 F. Supp. 542, 547 (S.D.N.Y 1968)).)  Plaintiffs do not make any specific arguments regarding how Defendants breached this duty of care, stating only that "for the same reasons discussed above regarding Plaintiffs' Eighth Amendment claim, genuine issues of material fact exist regarding Plaintiffs' claims for negligence."  (*Id.* at 22.)

In deciding whether a defendant has exercised ordinary care, "the conduct in question must be considered in light of all the surrounding circumstances."  NM UJI 13-1603; *Bober v. New Mexico State Fair*, 808 P.2d 614, 620 (N.M. 1991).  It is undisputed that Plaintiffs were confined to the shower in the context of a prison disturbance.  Defendant Hatch determined that lockdown was necessary in order to free up correctional officers throughout the facility and concentrate manpower in D-pod, to preempt an assault or escape attempt, and to prevent the spread of the disturbance to other areas of the facility.  (Doc. 67 at ¶ 6.)  I have already found that Plaintiffs have not established an Eighth Amendment violation as a matter of law.  In light of these circumstances, no reasonable jury could conclude that Plaintiffs' temporary confinement to the shower constituted a breach of ordinary care.  Accordingly, Defendants motion for summary judgment is granted as to Plaintiffs' negligence claim.[12]

IT IS SO ORDERED.

_William P. Lynch_
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

---

[12] Both parties offer arguments regarding emotional distress damages under the Prison Litigation Reform Act.  (*See* Doc. 67 at 26-27, Doc. 76 at 19-21.)  Because I have granted summary judgment on all of Plaintiffs' claims, I need not address these arguments.

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.